## J. E. FULLER, Appellant, v. JAMES E. LAWS and LEONARD EASTER, Respondents.*

Kansas City Court of Appeals.     May 4, 1925.

1. **PARTNERSHIP: Agreement Remains in Force Only Until Purpose of Partnership is Accomplished.** As between the parties themselves there is no question but that unless there is an understanding to the contrary, a partnership agreement remains in force only until the purpose of the partnership is accomplished.

2. ———: **To Entitle Plaintiff to Recover from Co-partners Proportion of Loss Sustained in Making Loan, Necessary to Show That Money Was Not Advanced by Plaintiff Personally But on Behalf of Partnership for Partnership Purposes.** In a suit in equity to dissolve alleged partnership and to recover of co-partners amount due from them to partnership as result of loss sustained when plaintiff loaned money to purchaser to buy farm from partnership, *held* before plaintiff could recover he was required to show that money lent purchaser not advanced by plaintiff on his own account but on behalf of partnership for partnership purposes.

3. ———: **Evidence Held to Show That Loan Made by Partner to Buy Farm from Partnership Was Not Advanced to Partnership But Was a Personal Loan, and That Partnership Was Not Thereafter Renewed When Farm Was Taken Back by Such Partners Upon Purchaser's Default.** Evidence *held* to show that money loaned purchaser to buy farm from partnership was not advanced to partnership but was a personal loan by partner to purchaser on security of the land, and that partnership was not renewed when farm, through default of purchaser, came back to such partner, so as to render the other partners liable for their proportion of the loss sustained as result thereof.

4. **APPEAL AND ERROR: In an Equity Case Where the Testimony is Evenly Balanced, Appellate Court Will Defer to the Finding of the Trial Court.** While in equity cases the appellate court may pass upon the weight of the evidence and arrive at its own conclusion as to facts as well as the law, it will defer to the finding of the trial court, who had the witnesses before him, where the testimony is evenly balanced.

---

*Corpus Juris-Cyc. References; Appeal and Error, 4 C. J., p. 898, n. 89.   Partnership, 30 Cyc., p. 418, n. 48; p. 441, n. 3; p. 737, n. 73.

Appeal from the Circuit Court of Mercer County.—
*Hon. L. B. Woods,* Judge.

AFFIRMED.

*John E. Powell, Laurence M. Hyde* and *Ira B. Hyde*
for appellant.

*A. C. Knight* and *W. K. Amick* for respondent.

BLAND, J.—This is a suit in equity to dissolve an
alleged partnership, to recover of defendants the amount
due from them to the partnership and to determine the
amount due from the partnership to plaintiff. The chan-
cellor, at the conclusion of the evidence, rendered judg-
ment for defendants and plaintiff has appealed.

The facts show that James Laws and Leonard Eas-
ter on August 6, 1919, purchased from one James K.
Reiger a farm containing 160 acres in Grundy county,
Missouri, hereinafter referred to as the Reiger farm,
agreeing to pay therefor the sum of $16,000. One thou-
sand dollars of this sum was to be paid on the signing of
the contract, one thousand dollars sixty days after date
and fourteen thousand on or before March 1, 1920. They
had also looked at a farm referred to in the evidence as
the Gibson farm, which contained 223.38 acres and which
they desired to buy, but having bought the Reiger farm
with the financial obligations entailed in that transac-
tion, they were unable to finance and buy the Gibson
farm, fearing that they would not be able to re-sell it
in time to raise the balance of the money to pay Gibson.
So on August 7, 1919, they approached plaintiff and told
him that they were trying to buy the Gibson farm. They
took plaintiff to view the Reiger farm and he told them
that he would lend them $100 an acre on it if they would
let him in as a partner. On August 8th Easter and Laws
purchased the Gibson farm for $25,000; thereafter they

told plaintiff of the purchase and that they would take him in as a partner. A contract was drawn between the parties on August 9, 1919, reading as follows.

"Above parties having bought what is known as the Harry D. Gibson farm of 223-38/100 acres, for a consideration of twenty-five thousand dollars and what is known as the Reiger farm of 160 acres for a consideration of $16,000 now therefore it is agreed that each is to pay for his third interest in the above-described farms according to contract, the title to same being held by James E. Laws and Leonard Easter.

"It is further agreed that in case of sale the profits or loss is to be divided equally between the three contracting parties."

On the day the contract between the defendants and plaintiff was entered into the Gibson farm was sold to one Coon for $30,156. $4000 was paid in cash to Gibson and the balance of the purchase price was to be paid on March 1, 1920. Coon paid down $2000. The sum of $5000 having been paid to Reiger and Gibson and the parties having procured $2000 from Coon, it was necessary for them to advance $3000 of their own money to cover the initial payments on the farms. This money was advanced by the parties, each paying $1000. Sometime after buying the Reiger farm defendants procured a loan of $8000 on it, secured by a first mortgage. Reiger was paid in full in February, 1920. The Reiger farm was sold by defendants on February 2, 1920, to one Wendt for $18,400 subject to the first mortgage of $8000, which was assumed as a part of the purchase price. Easter negotiated the sale of the farm to Wendt, who hesitated in buying it for the reason that he had only $3000 in cash and thought he was not in a financial position to make the purchase. Easter then went to plaintiff and asked him if he would lend $7400, being the difference between $3000 and $10,400, the amount that it was necessary for Wendt to raise in cash in order to buy the place, and if he would

take a second mortgage on the land so that Wendt would be enabled to buy it. Plaintiff agreed to furnish the money but did not want Wendt to know that he was interested in the property with defendants. When Wendt found that he could borrow $7400 from plaintiff he agreed to take the place and it was sold to him, the $7400 note and mortgage being taken in the name of the Mercer County Trust Company (where the parties made their financial arrangements) at the request of plaintiff, and immediately endorsed by the trust company to plaintiff. Wendt took possession of the farm but defaulted in the payment of taxes and interest for the first year and the property was deeded by him to plaintiff on February 28, 1921. The farm was subsequently sold at foreclosure by plaintiff at a loss of $5530.95, two-thirds of which, together with two-thirds of the taxes and interest that plaintiff had paid, he seeks to recover of the defendants.

It is insisted by plaintiff that the contract had between himself and defendants on August 9, 1919, created a partnership between them, and that the $7400 he lent in order to enable Wendt to buy the farm was advanced for the benefit of the partnership. Defendants deny that the contract created a partnership but contend that if one was created it came to an end on or about March 1, 1920, when, as the record shows without dispute, the sale by the parties hereto of the Reiger and Gibson farms was consummated and the profits of the venture arrived at and divided between the parties.

In order to intelligently pass upon the questions involved, it is necessary to state the testimony of the witnesses in some detail in order to make clear the facts admitted and those in dispute. Plaintiff in his own behalf testified that he and the defendants saw Wendt about getting a deed back to the farm sold Wendt in order to save the expense of foreclosure, and that they procured a deed from Wendt to the place, the grantee's name being left blank; that the witness took the deed to

the Mercer County Trust Company and deposited it there in escrow; that either Laws or Easter called on Wendt and brought him to town where the deed was made. The deed was left at the trust company for about nine months when plaintiff suggested to Easter that the latter get it, that it was the understanding of the witness that if the deed was not recorded within a year after it was made, it would have to remain on record for a year. Easter procured the deed, brought it to plaintiff's bank and in the presence of Easter plaintiff asked his daughter to insert the names of plaintiff and defendants in the deed as grantees and have it recorded, all of which was done. The envelope containing the deed had endorsed on it the following, "Deed, Wendt to Fuller, et al. Property of J. E. Fuller, Leonard Easter and Jim Laws." There was other evidence that this was in the handwriting of an employee of the trust company.

About a year after the farm was taken back, according to plaintiff's testimony, he and the defendants leased the same to one Roebeck; that the lease was negotiated by the plaintiff and Easter and that both signed the lease in the names of the three parties. The back taxes and the interest on the first mortgage were paid by plaintiff and defendants, each bearing his one-third part. Roebeck raised a crop on the premises, the proceeds of the crop coming to the lessors were divided equally between them. Some pasturage money coming from the place was likewise divided. Fuller further testified that during the time the farm was rented to Roebeck, Easter attempted to trade or sell it but was unsuccessful. In January, 1922, defendants first told plaintiff that they would not have anything more to do with the farm, Easter stating that he was not going to stand any of the loss, that "I was able to stand the loss, that he wasn't, they wasn't." Before this time, as a matter of compromise, plaintiff and Easter agreed that the farm should be sold for $14,000 if possible, and Easter figured .

up what the loss of each partner would be. Shortly after this last conversation plaintiff foreclosed his second mortgage upon the farm.

Plaintiff further testified that he agreed with Wendt that the second mortgage should be released as far as Wendt was concerned when the latter re-deeded the farm. He denied that he agreed to lend $16,000 on the Reiger farm, or $100 an acre. He testified that the defendants found a buyer for the farm in the person of Wendt and that he told the latter that he would lend him $7400 on the place but insisted that there was an understanding between the parties hereto that the firm was going to lend the money. When asked why the deed of trust was not taken in the names of the three parties, he answered that ''I was furnishing the money to the firm.''

''Q. Why didn't you take it (the mortgage) in your own name then? A. Because I wanted Easter and Laws behind it.

''Q. That is why you took it in the name of the Mercer Trust Company? A. Sure, I wanted them to help me pay this loss if there should be any.''

Later on he was again asked why it was drawn to the Mercer Trust Company and he answered that he did not know.

''Q. Then it isn't true you had it drawn to the trust company to hold Laws and Easter? A. I didn't say it did but it does. ·

''Q. In what way? A. That ain't for me to decide. . . .

''Q. Well, if the partnership was furnishing the money why didn't you write the papers in the partnership's name? A. Because it was my money.''

He further testified that the reason the Wendt deed was made in blank was ''so we could sell it (the farm) again;'' that about the 1st of March, 1920, he received the sum of $3502.95, being his one-third of the profits made on the two farms.

Roebeck, testifying for plaintiff, stated that he first talked with Easter about renting the farm and at that time Easter told him that the farm was owned by Fuller, Laws and himself; that about the time the lease expired, Laws told him that there was no partnership, that at that time it had been dissolved.

Plaintiff's witness, Grigsby, testified that either in 1920 or 1921, he thought it was in 1921, Easter asked him to purchase the farm. Plaintiff's witness, George, testified that he was in the real estate business in the city of Princeton; that Easter tried to sell the farm to him after it was deeded back by Wendt; that about four years prior to the trial, which occurred on the 1st day of June, 1923, Easter told him that plaintiff and defendants had purchased the farm and that it was in partnership and was for sale and that the witness and his son attempted to sell the place as real estate agents but that this was before the farm was sold to Wendt; that he showed the farm at one time after it was deeded back by Wendt and at that time Laws and Easter told him there was a chance to trade the farm to one Pixler; that they didn't say who owned the farm; that he talked to "all three of them (plaintiff and defendants)" in carrying on the negotiations at the time he showed the farm to Pixler.

Easter, testifying to defendants, stated that each of the parties had a profit of $3502.95, the whole amount of he profits having been divided between them after the farms were sold and the purchase price realized thereon. Checks were given to each party in that sum and were dated March 1, 1920; that the $1000 that had been paid down by Wendt on February 2, 1920, was immediately thereafter divided between the parties; that he went to plaintiff at the time he was negotiating with Wendt and asked him if he would lend $7400 on the farm and take a second mortgage therefor and that Fuller told him that he would furnish the money; that when defendants came to settle up with the persons from whom

they bought the two farms they lacked $6000 of having enough to pay for the Reiger farm for which an officer of the trust company allowed them to make an overdraft. That the officer allowed them to make this overdraft because he knew that Fuller was going to lend $7400 to Wendt, which would be sufficient to take care of the overdraft when the transaction with Wendt was settled; that Fuller was making a loan to Wendt and there was never an agreement or understanding that the witness would be responsible for the loan in any way.

The witness further testified that he did not know before he was sued that his name had been inserted in the Wendt deed as one of the grantees; that the last time he saw the deed the name of the grantee was left in blank; that he was not present when the names of the three grantees were written in the deed by plaintiff. That Fuller requested the witness, at the time Wendt made default, to see Wendt and ask him what he intended to do; that he saw Wendt and Wendt said he did not have the money to pay the interest and that he would deed the place back to Fuller; that he reported this conversation to Fuller on that day and that Fuller said he would prefer to do this rather than to foreclose and take a deficiency judgment against Wendt, in order to save the expense of foreclosure; that Fuller agreed to accept the deed, assume the interest and taxes against the the place and release Wendt, and that the witness thereupon telephoned Wendt asking him to come to Princeton where Wendt made the deed, leaving the name of the grantee in blank at the request of Fuller; that Fuller told Wendt that he would take the farm back subject to the first and second mortgages and release Wendt from what there was against it.

Easter further testified that on the same day that the Wendt deed was made Fuller told the witness that he wanted him and Laws to try to trade the farm and to take the deed from Wendt and keep it and if they had

a chance to trade or sell it, to insert the name of the buyer as grantee in the deed; that the incumbrance against the property was figured up and it totaled $15,-400 and that Fuller requested the witness and Laws to sell or trade the property and that each would receive one-third of whatever it brought above the incumbrance; that this was agreed to and that he and Laws rented the place from Fuller on the basis that they each pay one-third of the accumulated taxes and interest on the first mortgage against it, together with the one-third of the up-keep of the farm; that the Wendt deed was delivered to Fuller who kept it a few hours and then delivered it to the witness who kept it in his safety deposit vault at the bank until it was re-delivered to Fuller.

The witness further testified that the reason Fuller was taken into the partnership was that he agreed to furnish the money to pay for the farms if they were not sold in time and that had it not been for the money Fuller advanced to Wendt, there would have been no profits to have been divided. The witness testified positively that Fuller advanced Wendt the $7400 on his own account and not on behalf of the so-called partnership. He admitted that he signed the lease to Roebeck and denied that he figured out what the loss of each party would be in case the farm was sold for $14,000 as testified to by Fuller.

Laws testified that Fuller agreed to lend $100 an acre on the Reiger place and that when defendants told Fuller about the Gibson place Fuller said that if they would "let him in on both places he would furnish all the money they needed;" that he was not present when Fuller lent Wendt $7400; that he did not agree to lend Wendt anything; that it was not a partnership loan; that after Fuller obtained the deed from Wendt, he wanted the defendants to take the place on shares; that they were to have a one-third interest in the proceeds of the place and that they were each to pay him one-third

of the interest on the $8000 first mortgage and one-third of the taxes, and if they sold the place for more than $15,400, the excess was to be divided equally; that the $15,400 was made up by the $8000 first deed of trust and the $7400 second deed of trust; that he had never heard that his name had been inserted as grantee in the Wendt deed until after this suit was brought; that he paid his one-third of the interest and taxes to Fuller; that it was agreed that defendants could either farm the place themselves or rent it out; that he did not know anything about its being rented out to Roebeck until after it was actually leased; that there would have been no money to divide in March, 1920, if Fuller had not lent the $7400 to Wendt; that he thought the $7400 went to Reiger to pay the balance owing him by the partnership; that it went towards paying for the partners' interest in the Reiger farm and that it was furnished for the benefit of all, but he denied that it was lent to the partnership, and taking his testimony altogether (he was an uneducated man) we construe it to mean that while the $7400 was not lent to the partnership, the partnership was benefited because it enabled the partnership to sell to Wendt, meet its debts and thus realize a profit.

Wendt testified that Easter approached him about buying the place but that the witness had only $3000 and was not interested in it; that Easter went away and then came back and asked him to go down the street where they met Fuller who agreed to furnish the $7400 necessary for the witness to make the deal; that Fuller agreed to take a second mortgage as security; that after he defaulted Easter came to him and told him that he came on behalf of Fuller and said that if he would come to town and make a deed to Fuller everything would be all right; that he came to town and Fuller asked him to deed the place over and that if he would do this Fuller would never bother him about a deficiency judgment; that it was his intention to deed the place to Fuller and he

thought that he was to do so; that before the deed was signed, he found out that the name of the grantee was to be left blank; that Fuller did not say that the deed was to be made to him but only asked him to "deed it over;" that he did not know that Fuller had any interest in the farm when the witness bought it; that Fuller told him that he, Fuller, would furnish the money, the $7400.

Witness Lowry testified that he was secretary of the Mercer County Trust Company; that he wrote the second deed of trust at the request of Fuller; that Fuller made the loan and not the trust company; that the witness originally wrote the mortgage in favor of Fuller but later to the trust company at Fuller's request, Fuller merely stating that he did not want it in his name but to make it to the trust company and then assign it to him; that Fuller told him that he was making the loan; that the balance of the money on the two farms was paid by the defendants by checks drawn by them; that the witness certified a check for $21,000, the balance due Gibson, and that Fuller along with defendants signed a note to the trust company in that amount, but it was unnecessary to use the note. (It seems that the money transactions in closing these deals were handled by the trust company.) That Fuller, prior to the time the $7400 loan was made, inquired of him as to Wendt's character and standing.

This being an equity case, we have attempted to set out the testimony of the witnesses so far as we deem it material. The record is a very long one and is teeming with facts, a great many of which are contradicted, and should we mention all of the facts in detail it would be necessary for us to set forth a large part of the record, which, of course, would not be practicable.

It is the contention of plaintiff that the contract entered into between the parties to this suit on August 9, 1919, made them partners in the handling of the two farms, that when a partnership has been proved to have

existed its continuation will be presumed until notice of dissolution; that there was never any dissolution of the partnership, and the taking back of the farm from Wendt was under and in harmony with it; that even if the partnership was completed and dissolved at the time of the conveyance of the land to Wendt, and the profits from the sale of the two farms were divided, the partnership was renewed when the parties took the farm from Wendt and agreed to share the expenses and upkeep of the place until it was sold, when the net proceeds would be divided between the parties.

Defendants contend that the contract of August 9, 1919, did not create a partnership but that the relation between the parties was that of tenants in common, and, at most, they were merely joint adventurers. As the relationship between the parties in this instance, should we hold it to be that of a joint adventure, would be substantially the same as that between partners, it is not necessary for us to differentiate between the two relationships. It is stated in 33 C. J., p. 842, in discussing one of the distinguishing features between a partnership and a joint adventure—

"As respects the character of the business undertaken, the principal difference is that, while a copartnership is ordinarily formed for the transaction of a general business ~of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years."

And in 15 R. C. L., pp. 500, 501—

"While it is true that at common law coadventurers in an enterprise were recognized in courts only when the element of partnership was disclosed and on proof of the essential of a partnership, it is so similar in its nature and in the contractual relationships created thereby that the rights as between the adventurers

219 Mo. App.—23.

are governed practically by the same rules that govern partnerships. A joint adventure generally relates to a single transaction. The usual test of a partnership as between the parties to a joint adventure is their intent to become partners." [See also Hoge v. George, 18 A. L. R., p. 469.]

It is well settled that—

"If no date is fixed by the contract of joint adventure for its termination, the agreement remains in force until its purpose is accomplished. And it has been held that when the specified time has expired the adventure is dissolved without any further action by the parties, but that the adventure may be continued after the stipulated time by either express or tacit agreement." [15 R. C. L., p. 506.]

It seems to be the rule in partnerships, as well as in joint adventures, that the partnership agreement remains in force only until the purposes of the partnership have been accomplished, for in Citizens Trust Company v. Tindle, 194 S. W. 1066, it was held that a mercantile partnership which sells its entire stock and thereafter ceases to buy and sell goods is in law dissolved. The notice of dissolution in such a case is merely important in reference to rights of third parties dealing with one of the partners without notice of the dissolution. As between the parties themselves there is no question but that unless there is an understanding to the contrary, the partnership agreement remains in force only until the purpose of the partnership is accomplished. See Lubbock Grain & Coal Co. v. Ferguson, 227 S. W. 539, 541 (Texas), where it is stated that—

"A sale which practically includes all the property used by the firm in carrying on its business, whether made by the firm or a member thereof, operates as a dissolution of the partnership." (Citing numerous authorities.) [See also Cavasso v. Downey, 188 Pac. 594; Seufert v. Gille, 230 Mo. 453.]

It would seem that under the terms of the contract had between the parties on August 9th the venture, whether called a joint adventure or a partnership (and for the purposes of the case we assume. that it made the parties more than merely tenants in common), was ended when the farms were sold, for it provides that *"in case of sale* the profits or loss is to be divided equally between the three contracting parties." This indicates that there was to be a termination of the partnership when the farms were sold and the money realized on them. This evidently was the construction put upon their agreement by the parties as at that time the profits, there being no loss, were divided among the parties. This it would seem ended the partnership entered into between the parties on August 9, 1919, unless something thereafter was done by them to revive the relationship.

But, aside from this, in order for plaintiff to recover it was necessary for him to show that the $7400 lent to Wendt was not advanced by plaintiff on his own account but on behalf of the partnership for partnership purposes. The weight of the testimony appears to be that this money was not advanced to the partnership but was a personal loan from plaintiff to Wendt on the security of the land. The rule is well settled that while in equity cases the appellate court may pass upon the weight of the evidence and arrive at its own conclusion as to facts as well as the law, that it will defer to the finding of the trial court who had the witness before him, where the testimony is evenly balanced. [Broaddus v. Broaddus, 221 S. W. 804; Finley v. Schlueter, 54 Mo. App. 455, 458.] Had the money been lent to the partnership we would expect to find that it had been deposited to the credit of Laws and Easter who took title to the farms in their own names and were handling the transactions on behalf of the partnership, the interest of Fuller at his request not being disclosed to Wendt, and that the money would have been lent to Wendt in the name of

Easter and Laws and the note and deed of trust made to them. Of course, the transaction was not handled in this way. Fuller alone directed the manner in which the note and deed of trust were to be executed; he directed that they be made in the name of the trust company, to be afterwards assigned to him. Defendants had no control over the note and deed of trust and had no interest in them. They were assigned to Fuller and he retained possession of them.

Plaintiff contends that as the $7400 was paid directly to the trust company and used to pay the firm's overdraft, and as he had agreed to advance up to $100 an acre on the farm (this last he denied at the trial), and as the full purchase price of the farms had not been entirely arranged for until the $7400 was paid by him to the trust company, that the effect of the transaction was that plaintiff advanced $7400 in order to meet a part of the purchase price of the farms, two-thirds of which defendants are responsible for. He claims that he had the $7400 note and deed of trust assigned to him and retained possession thereof merely as security for his advance of the $7400 to the partnership. It is pointed out that defendants admitted that there would have been no profits had Fuller not lent Wendt the $7400.

It is plain enough from the facts what actually occurred. While as a matter of convenience the $7400 was paid by plaintiff to the trust company in order to settle up the transactions then pending, the effect of what was being done was that the money was being advanced to Wendt and Wendt was turning it over to the trust company for the use and benefit of the partnership. The farm being sold to Wendt was not only security for his loan but Wendt was personally liable for the $7400, it was therefore Wendt's money being used to meet the overdraft of the partnership given to settle for the two farms. Of course, in the absence of any effort to prevail upon some one other than Fuller to advance the

$7400, it is a fact that the $7400 Fuller furnished Wendt made possible the profit realized from the venture. But, as we have already stated, the clear weight of the evidence is that the money was not advanced to the partnership but to Wendt.

As to the matter of taking a deed back from Wendt in blank and the filling in of the blank with the names of the three parties by Fuller, there is ample evidence that Easter called upon Wendt at the request of Fuller and acted for him alone and that the agreement releasing Wendt from personal liability was had between Wendt and Fuller, and there was ample evidence that the names of the defendants were written into the deed without their knowledge or consent. The fact that the deed remained in the bank in escrow or in the safe deposit box of Easter, is not a circumstance necessarily tending to show that it was in the possession of the partnership for it remained in the possession of Easter because he and Laws had been authorized by Fuller to sell the farm, Fuller desiring that the conveyance be made directly from Wendt to the buyer and that Easter should fill in the name of the buyer when one was procured. Fuller did not desire to make the deed with himself as grantor.

We do not think there is anything in the contention that the partnership was renewed when the farm came back to Fuller but rather that the contract between the parties at that time was a new and separate transaction. At that time the original relation between the parties had been terminated for almost a year; all the profits of the original enterprise had been divided and a new contract, which was verbal, entered into. Defendants in effect agreed with plaintiff, at the latter's request, that they were to receive two-thirds of the proceeds of the farm in consideration of their paying two-thirds of the interest accruing on the first loan of $8000 and two-thirds of the taxes for the year 1921 and two-thirds of the upkeep of the farm during the coming season, during which

or at the end of which, it was hoped the farm would be sold. In addition to this, defendants were *employed* by Fuller as agents to sell the farm and to *receive as compensation* therefor two-thirds of any sum that the farm sold for over and above $15,400. There is some question as to whether it was the taxes for the year 1920 or the year 1921 that is involved, but there is evidence in the record that it was for the year 1921.

The $15,400 represented the first mortgage of $8000 plus plaintiff's $7400 loan on the farm. In this transaction Fuller treated the matter as though he himself was involved in the farm to the extent of $15,400. The contract does not indicate that defendants were to be liable for any part of this sum and if they were liable for any part of it they were also liable for the interest upon the $7400 advanced to Wendt by Fuller as well as the interest on the $8000, yet the farm was to be sold and all above the sum of $15,400 was to be divided equally between the parties, showing conclusively that Fuller recognized that defendants were not liable for any part of the interest upon the $7400 that Fuller now contends was advanced to the partnership. Why did Fuller agree that the proceeds of the crops should be divided between the parties if defendants owed him two-thirds of $7400? Why was it not agreed that plaintiff should be reimbursed for the money he had paid out before defendants be paid anything? The matter of defendants' being responsible for the $7400 was not even mentioned. Defendants were unable to sell the farm but there was ample evidence that they performed all of their part of the second, or verbal, contract, and there is no liability on their part under this contract.

There is nothing inconsistent with the claim of defendants that they were not interested in the land after it was turned back to Fuller because they listed it with a real estate agent for sale or trade, for the reason that they had been employed by Fuller to sell the land. If a

new partnership was entered into after the farm came back, it covered only the manner of the profits that were to be made in the cultivation of the farm and, possibly, by putting an extreme construction on the testimony, it might be said in the sale of it, and did not contemplate any loss on the $7400 transaction for the verbal contract treated the situation as though Fuller had $15,400 in the farm and when the farm was sold he was to be taken care of to that extent and everything above that amount was to be divided equally between the parties.

We have examined the cases cited by plaintiff and find them not in point. The case of Jones v. Davies (Kans.), 56 Pac. 484, is mostly relied upon. In that case the parties bought real estate but the title was taken in the name of one of them who gave a deed of trust on the property for a part of the purchase price. Of course, under such circumstances the deed of trust was given in lieu of the partners' advancing all cash for their respective shares of the purchase price. The deed of trust was therefore unquestionably given for the benefit of all the partners as it went towards the payment of the purchase price of the land in which the partnership was dealing. The land was foreclosed and the suit was to obtain a deficiency judgment against the other partners except one and against the assignee of that one. The court held that they were all liable. Of course, that is not this case. Here the $7400 was not advanced to the partnership for the purpose of buying the land in which the partners were dealing but was a loan made from Fuller to Wendt to enable Wendt to buy the farm. Of course, it may not be material as to Fuller's motive in making this loan; he may have made it in order to have made it possible for him to realize a present profit upon the farms, thinking that the farm sold to Wendt was ample security for the loan. These deals were being made in boom time. Whatever his motive may have been, there is ample testimony that he made the loan to Wendt and not to the partnership.

This is certainly a case where the evidence is such that we should defer to the holding of the chancellor who had the witnesses before him and was in a better position than we to pass upon the disputed facts. In our statement of facts there is disclosed some testimony which taken by itself might tend to show that the partnership was renewed, especially some alleged admissions of defendant Easter, but the whole record is such that we do not feel that we would be justified in disagreeing with the chancellor.

The judgment is affirmed. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.