**EAGLE–PICHER CO.**

v.

**MID–CONTINENT LEAD & ZINC CO.**

No. 4733.

United States Court of Appeals
Tenth Circuit.

Feb. 2, 1954.

John R. Wallace, Miami, Okl. (Willard L. Phillips, Thos. M. Van Cleave, Kansas City, Kan.; A. C. Wallace and Ben T. Owens, Miami, Okl., on the brief), for appellant.

Emerson Foulke, Joplin, Mo., and J. E. Schroeder, Kansas City, Kan., for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The parties hereto were the owners of separate mining leases covering land in Cherokee County, Kansas, from which lead and zinc were mined.[1] They entered into a contract to pool their interests and consolidate the operations of the leases for their mutual benefit. The defendant was to conduct the mining operations on the land and the plaintiff was to receive the mineralized ore in hoppers located on the leased premises and transport it to its Central Mill, located at Cardin, Oklahoma, about 25 miles away, there to prepare it for market and sale. The leases on all the land expired on February 17, 1937, and the contract contemplated that Mid-Continent would obtain a ten-year lease in its name on all the property. The ten-year lease was obtained and at its expiration was extended to June 6, 1953. Prior to June 6, 1953, Eagle-Picher obtained leases in its own name covering 11/12 of the land and Mid-Continent obtained a lease on 1/12 of it. Mid-Continent contended that the operating contract was still in effect, and the plaintiff brought this action under the Federal Declaratory Judgments Act, 28 U.S.C.A. §§ 2201, 2202, for a decree declaring that the contract had terminated and that Mid-Continent had no further right in the property which it had leased. The trial court held that the contract was not terminated, and that the rights of the parties were to be governed and determined by it. The precise issue to be determined on this appeal is whether the parties were engaged in a joint adventure and whether that relationship had been terminated.

To determine this question, we must look to the language of the contract, the relationship existing between the parties, and the background against which it was executed.

During the year 1935, each of the parties were separately operating mines under leases of lands from the same ownership. Mid-Continent had a concentration mill on its property. Eagle-Picher had constructed a new Central Mill in northern Oklahoma. All of the leases were to expire in 1937. The parties believed that new leases could be obtained from the owners and they were desirous of consolidating the operation of their properties. Prior to the execution of the contract the parties had mined the leases for many years. The contract provided specifically for the mining operations and the processing of the ore and that the profits should be divided equally between the parties. It was agreed that Mid-Continent should obtain the new leases in its name but subject to the terms of the contract. The contract contained no termination date. When it was executed, and as a part of the same transaction, Mid-Continent conveyed to Eagle-Picher by Bill of Sale the concentration mill, tools, machinery and equipment which were located upon its leased lands. The Bill of Sale contained a provision that the property was not to be removed from the premises until the milling operations of Eagle-Picher proved satisfactory and

1. The parties will be referred to herein as plaintiff and defendant as in the court below, or as Eagle-Picher and Mid-Continent.

effective. As contemplated by the parties, Mid-Continent obtained a ten-year lease on all the property.

The concentration process at the Eagle-Picher plant was new and unproven. The contract provided that if this process developed to be unsatisfactory to Mid-Continent or the land owners, the ore would be processed by Mid-Continent in its plant located on the leased land, in which event the profits were to be shared equally between the parties. This provision never became operative as the Central Mill proved to be satisfactory and the ore was shipped to it during the term of the ten-year lease and during the extension which expired on June 6, 1953. The leases and the machinery and equipment on the land constituted all of the property of Mid-Continent. Some time prior to the expiration of the extension of the lease, the president of Mid-Continent notified Eagle-Picher that his company would not be able to renew the leases; that other individuals were trying to get them; and that Eagle-Picher should take such action as it saw fit to protect itself. The undisputed evidence was that the president was not authorized to make the statement, but this is not important to a decision of the case as no issue of estoppel was raised.

To constitute a joint adventure there must be a combination of two or more persons devoted to a specific enterprise. They must agree to combine their property, efforts, skill and knowledge in a common undertaking. There must be an agreement for joint property interests in the undertaking and a sharing of the profits or losses. Blackner v. McDermott, 10 Cir., 176 F.2d 498, 500; Grannell v. Wakefield, 172 Kan. 685, 242 P.2d 1075; Yeager v. Graham, 150 Kan. 411, 94 P.2d 317; Shoemake v. Davis, 146 Kan. 909, 73 P.2d 1043, 1045; Livingston v. Lewis, 109 Kan. 298, 198 P. 952; A. C. Houston Lumber Co. v. Marshall, 109 Kan. 172, 197 P. 861; Crawford v. Forrester, 108 Kan. 222, 194 P. 635; 30 Am.Jur. Joint Adventures, Sec. 7.

The duration of a joint adventure may be fixed by the terms of a contract between the parties or by mutual consent. If no date is fixed by the contract for its termination, the agreement remains in force until its purpose is accomplished or until such accomplishment has become impracticable. Goss v. Lanin, 170 Iowa 57, 152 N.W. 43; Fuller v. Laws, 219 Mo.App. 342, 271 S.W. 836; Bane v. Dow, 80 Wash. 631, 142 P. 23; Blackner v. McDermott, supra: 30 Am.Jur. Joint Adventures, Sec. 44. This enterprise was brought about by the joint efforts of the parties and each had a definite part to perform for its success. Each contributed its leases and its efforts to the enterprise for the purpose of profit. We agree with the trial court that the contract created a joint adventure between the parties and that the relationship was fiduciary in character.

A joint adventure generally is considered a partnership not general in operation or duration, but limited to a particular enterprise or venture. Grannell v. Wakefield, supra; Shoemake v. Davis, supra; Livingston v. Lewis, supra. The relationship imposes upon the parties an obligation of loyalty to the joint enterprise and utmost good faith, fairness and honesty in their dealings with each other with respect to the subject matter. The trial court held that this relationship prevented Eagle-Picher from securing for its own benefit the leases included in the joint undertaking. This holding is correct unless that relationship was terminated at the end of the ten-year lease period.

It is the position of Eagle-Picher that, conceding the existence of a fiduciary relationship between the parties, when the contract creating that relationship is considered as a whole, it discloses that the parties intended that the contract should terminate at the end of the 1937 lease and in no event after the one extension to June 6, 1953. To determine the intention of parties to a contract and the meaning of its language,

it must be construed as a whole and not from isolated portions. Tate v. Stanolind Oil & Gas Co., 172 Kan. 351, 240 P.2d 465. In re Hill's Estate, 162 Kan. 385, 176 P.2d 515; Wood v. Ozark Pipe Line Co., 142 Kan. 333, 46 P.2d 614. The recital clauses of the contract refer only to the ownership of the existing mining leases, and that the owners of the land had agreed to give Mid-Continent a ten-year lease on all the property. There is also a recitation of the duty of each party in the performance of the contract. The clauses contain no intimation that the contract shall expire at the end of the ten-year lease. The only language found in the contract which may be construed as having reference to the intention of the parties as to a termination date is found in paragraphs two and six. Paragraph two provides that Mid-Continent shall mine the entire acreage available for mining for the unexpired term of existing leases, "and thereafter mine the entire acreage commencing at the expiration of the present leases and place the mineralized mine-run dirt in hoppers designed and located by first party, all in keeping and in accordance with the terms and conditions of the present leases as modified * * *." There is no limitation as to time in this section and the use of the word "thereafter" seems to indicate that the term was not limited.

Paragraph six deals with the rights and duties of the parties if the operation of the Central Mill was not satisfactory. In this event, Mid-Continent agreed to operate the mines and process the ore in its mill located on the land and to equally divide the profits with Eagle-Picher "for the entire period of the old lease and any extension or renewal thereof, regardless in whose name it is taken, * * *." Eagle-Picher contends that considering the contract as a whole and the purposes for which it was executed, it becomes clear that this section as well as the contract relates to only two periods, namely one from the date of the contract to the expiration of the old leases in 1937, and the other to the new ten-year lease to be obtained by Mid-Continent at the end of which the relationship terminates. We think this would be a strained construction of the contract language. The parties had been mining their respective leases for many years. There was no indication in the record that they could not continue to do so and produce ore in commercial quantities or that when the contract was executed they intended to give up any of the advantages or rights which they might have had in the existing leases. They sought only by the contract to consolidate their interests and efforts into a joint operation to reduce overhead and to obtain a more efficient and economical operation for their mutual benefit. It seems unlikely, without specific language, that the parties intended to dissolve this relationship at the end of ten years and permit either of them to obtain the valuable mineral leases which the other had and could have retained. This would appear to be particularly true in view of the fact that Mid-Continent conveyed its milling plant and other personal property to Eagle-Picher and placed itself in a position where it could not process its own ore. Although paragraph six never became operative, it may be referred to in determining the intention of the parties as to a termination of the contract. This section says in plain words that the profits shall be divided equally between the parties over the period of the old leases and any extension or renewal thereof, and does not contemplate that at the end of the ten-year lease either party to the joint adventure could obtain an advantage over the other by obtaining a new lease or a renewal of the old one. This is almost the identical situation which existed in the Blackner case and the language used in that case is particularly appropriate where this court said [176 F.2d 501]:

"It is argued that the words 'extension' and 'renewal' used in the operating agreement did not include the new lease subsequently issued to Blackner. But the contention leaves

out of consideration the fact that the operating agreement provided in effect that the respective rights of the parties under it should extend throughout the term of the application, the lease or leases, and any extension or renewal of the lease or leases. It may be that as between the United States and Blackner the second lease was a new one rather than an extension or renewal of the former lease. But that is not the test here. The test to be applied here is whether as between McDermott and Blackner the second lease was an extension or renewal of the first, within the intent and meaning of the original operating agreement. And in resolving that question, the language contained in the operating agreement, the relationship existing between the parties, and the background against which the agreement was drafted and entered into must be taken into consideration. Viewed in that manner, it is crystal clear that it was the mutual intention of the parties in entering into such agreement that their rights should continue throughout any lease which should issue as the outgrowth of their joint efforts then being exerted in connection with the preparation and filing of the original application, and otherwise. When all of the facts and circumstances are taken into consideration and given the weight to which they are entitled, it would unduly narrow the scope of the contract to construe it as having application only to the original lease, either during its primary period or during an extended or renewal period of it, but not to a subsequent lease to the same lessee which was the outgrowth of the joint efforts of the parties at the time of the filing of the application for the original lease and at the time of the issuance of such lease."

Considering all the facts and circumstances existing at the time the contract was entered into, we think the

parties intended that the venture should extend not only during the ten-year lease period but during any subsequent lease obtained by either party and to any renewal or extension thereof and that it should remain in effect so long as the mining leases were commercially profitable and practicable.

Judgment is affirmed.