**MERIDIAN HOMES CORPORATION,**
Plaintiff,

v.

**NICHOLAS W. PRASSAS & COMPANY, Defendant.**

No. 80 C 12.

United States District Court,
N. D. Illinois, E. D.

Dec. 30, 1980.

Stuart Smith, Wexler, Siegel & Shaw, Ltd., Chicago, Ill., for plaintiff.

Richard J. Brennan, Winston & Strawn, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff Meridian Homes Corporation ("Meridian") has moved for partial summary judgment on the issue of its right to terminate the joint venture relating to the Hampton Park Terrace Shopping Center property (the "Venture") in Romeoville, Illinois. In opposition to that motion and in support of its own cross-motion for summary judgment, defendant Nicholas W. Prassas & Company ("Prassas") asserts that:

(1) Meridian never became a member of the Venture and therefore has no right to dissolve it or seek a decree of dissolution.

(2) In any event, the Venture was not terminable at will.

For the reasons stated in this memorandum opinion and order, Meridian's motion for partial summary judgment is granted in part and denied in part and Prassas' cross-motion for summary judgment is denied.

### Facts

On April 25, 1961 Prassas (then known as George W. Prassas & Company) entered into a joint venture agreement (the "Agree-

ment") with Alexander Construction Company ("Alexander") for the proposed development in three approximately equal Project Areas of acreage in Romeoville then owned by Alexander. At issue in this action is the nine-acre tract referred to in the Agreement as Project No. 1. In essence the Agreement provided for Prassas to be the developer and Alexander to be the financier. Title to the real estate was to be held in a LaSalle National Bank land trust, with the beneficial interest of Prassas to be assigned to Alexander (though not specifically so stated, obviously as security for its financial advances to the Venture).

Financial arrangements regarding the Venture were straight-forward as such ventures go. After improvement of the property the net cash flow was divided equally between the venturers, with Alexander "to the extent permissible under the Internal Revenue Code, [to] have the benefit of the entire depreciation deduction available to the joint venture" (Agreement ¶ 5). Upon sale of the real estate, the net proceeds of sale after payment of mortgage and other indebtedness would first be paid to Alexander to the extent of the agreed value of the land and all funds advanced by Alexander, with any surplus then to be divided equally between the venturers.

Agreement ¶ 4 provided:

It is agreed that First Party may develop Project No. 1 in separate stages consistent with economic operation and the terms and conditions of this agreement shall apply separately to each stage until the property in Project No. 1 shall have been fully developed.

Agreement ¶ 7 gave Alexander an option to acquire Prassas' joint venture interest within "ninety days after completion and opening for business of a minimum of 500 front feet of store units constituting the entire planned portion of Project No. 1 . . . ." It went on to provide:

In the event this option is not exercised, the joint venture shall continue and the parties agree that thereafter they shall offer the property for sale and [Prassas] shall be the sole designated agent to offer the property for sale.

Agreement ¶ 8 required that "[i]n the event that the property is sold as vacant, both parties must be in agreement. . . ." Except for the provisions just quoted and summarized, the Agreement was silent on the subjects of its term or its termination.

Initial development of the property involved a small shopping center (about 31,-000 square feet of store area, with a Jewel store of 15,000 square feet as the major tenant) occupying about five of the nine acres, begun and completed promptly after entry into the Agreement. No other development took place until after 1970, when Prassas negotiated a new Jewel lease calling for remodeling of the existing store and a 25,000 square foot addition. Because that deal would have required an estimated additional $300,000 capital contribution by Alexander over and above the added mortgage financing obtainable by Prassas, the affidavit submitted by Nicholas W. Prassas ("Nicholas") with the current Prassas motion states:

Alexander initially objected to this second phase of the development of Project 1 and proposed that Prassas Company buy Alexander's interest in the joint venture.

Prassas rejected that offer, Alexander ultimately proceeded (with a somewhat smaller capital contribution) and the addition was built in 1972. No other development has taken place or is now planned, and now Meridian (which claims to be the present successor to the Alexander joint venture interest) wants out.

Initial development of the property in 1961 comprised approximately 281 front feet of store units. Another 175 front feet were involved in the 1972 addition. Thus the development to date aggregates 456 front feet, and the point (500 front feet) that Agreement ¶ 7 called "the entire planned portion of Project No. 1" and that would trigger the option under that Paragraph has never been reached.

In August 1972 Prassas received a Notice of Assignment, stating that Alexander had sold and assigned its entire interest in the Agreement to Allister Construction Compa-

ny ("Allister"). Without any formal consent being asked by Allister or given by Prassas, Prassas thereafter treated Allister in all respects as its fellow joint venturer. Some two and one-half years later Allister found it necessary, as part of a financing transaction with the Continental Bank, to ask a formal acknowledgement of its succession to all of Alexander's interest under the Agreement. Prassas immediately complied with that request.

From the time of its incorporation in 1972 (just prior to its transaction with Alexander) Allister was a wholly-owned subsidiary of Meridian.[1] In connection with a 1977 transaction in which certain Allister employees were acquiring a stock interest in that corporation (to give them an equity participation in another real estate project), Meridian required Allister to transfer to Meridian all of its other property interests, including the interest in the Hampton Park Shopping Center and the Venture.

Accordingly on February 7, 1978 the same lawyer who had acted for Allister in notifying Prassas of the Alexander-Allister transaction sent Prassas the following certified letter:

> On August 30, 1972 the undersigned advised you of the assignment by Alexander Construction Company to Allister Construction Company of the beneficial interest of Alexander Construction Company in the trust referred to above. Please be advised that Allister Construction Company, by assignment dated June 14, 1977 has assigned to Meridian Homes Corporation the beneficial interest of Allister Construction Company in said trust.

In response to Nicholas' subsequent telephone call, the attorney sent him on February 10, 1978 the copy of the assignment of beneficial interest (the conventional LaSalle National Bank form of assignment) covering "all our rights, titles, powers, privileges and beneficial interest, in and to all (100%) of the entire beneficial interest in, to and under" the LaSalle National Bank land trust agreement (thus including the Prassas collateralized interest). That assignment was made subject to the Prassas power of direction as to leases, mortgages and property operation, but specifically required written approval of *Meridian* for any *conveyances* of the joint venture real estate.

Again as with the Alexander-Allister transfer, no formal consent was asked of or given by Prassas. However, the following is reflected and uncontested in the parties' submissions with their cross-motions for summary judgment:

1. Ever since the assignment 50% of the cash flow from the property has been sent to Meridian not Allister. Meridian and not Allister has been given "the benefit of the entire depreciation deduction available to the joint venture" as provided in Agreement ¶ 5.

2. Prassas has not communicated any requests for approvals, any accountings or any other communications relating to the Venture or its status to Allister since receiving notice of the assignment.

3. After the notice of assignment Meridian's general counsel, John Winston, has met on numerous occasions with Nicholas "to discuss past dealings of the joint venture as well as future dealings of same." Winston "has been the representative of Meridian who has dealt with Prassas' representatives with respect to the operation of the Venture." At no time during those meetings or "in any communications with

---

1. For legal purposes it is not significant whether *Prassas* knew of the parent-subsidiary relationship (as discussed hereafter, Meridian's knowledge as Allister's parent, regarding Prassas' treatment of Allister as the joint venturer without requiring a formal consent, is sufficient for estoppel purposes). But it may be noted that Nicholas' December 23, 1980 affidavit, furnished at the Court's request, denies any personal knowledge as to that relationship. Yet on November 17, 1980, in his deposition in a litigation with his relatives relating to the Venture, the same Nicholas said:

> The assignment from Allister came to us in '77 to Meridian Corporation. That's the parent company of Allister.

To the same effect, the affidavit of Walter Clements on behalf of Meridian states specifically that he had discussed with Nicholas the fact of Meridian's controlling stockholder interest in Allister.

representatives of [Prassas] concerning the joint venture has [Winston] been advised that Meridian . . . is not the joint venturer of [Prassas]" (that position was first asserted by Prassas December 13, *1979*, in response to Meridian's December 3, 1979 notice that it wished to withdraw from and dissolve the Venture).

4. On December 7, 1978 certified public accountants P.L. Crawford & Co., employed by Prassas as the outside auditors for the Venture, issued to Prassas their certification of the statements of cash receipts and disbursements of the Venture for the year ended November 30, 1978, a copy of which has been provided to Meridian. Those financial statements were based solely on information derived from Prassas (no Meridian personnel having provided any information to the Crawford firm). Note 2 to the certified financial statements read:

> Effective January 1, 1978 Meridian Home Corp. acquired the interest of Allister Construction Co. in Hampton Park Terrace Shopping Center.

Nicholas' December 23, 1980 affidavit, furnished in response to the Court's request, states only with respect to Note 2:

> That statement does not reflect any entry on the books and records of the Joint Venture as maintained by Prassas Company, nor does it actually reflect any document in the possession of Prassas Company or to which Prassas Company is a party, nor is Note No. 2 referenced in the statements.[2] Note No. 2 represents the unsolicited conclusion of Crawford as to the legal effect of transactions to which neither Prassas Company nor the Joint Venture were parties. Prassas Company does not agree with said statement, and it is not material or relevant to the accuracy of the Cash Receipts and Disbursement Statement prepared by Crawford.

It is noteworthy that Nicholas' affidavit is wholly silent as to any objection to, or attempted correction of, Note 2 having been made by Prassas.

5. Among the post-assignment written communications from Nicholas to John Winston of *Meridian* are the following:

(a) In an August 14, 1979 letter Nicholas wrote:

> Thought it prudent that you should see a copy of the Lease for the restaurant in Romeoville, Hampton Park Terrace Shopping Center. This Lease is before the tenants' attorney awaiting approval.
>
> Would like to call your attention to the fact that these tenants had a right to assign to a corporation in their previous Lease and were released from liability after they had completed five years of the term.
>
> Enclosed for your perusal is a copy of page 8, Section 11 of the previous Lease in case their attorney makes a similar request. If you have any doubts about acquiescing to that kind of a change, please notify me.

(b) On August 29, 1979 Nicholas wrote:

> In the event the Lease is executed by the tenants tomorrow, it will be necessary to give them a release, which is enclosed for your approval. In this way, we could conclude the transaction.
>
> In the event we encounter new crises, I will give them a one-year lease, which will allow ample time for them to find buyers who would make a lease on new terms with us. At this point, I think this is the best way to handle the disgruntled partners.
>
> Please sign and return the letter of agreement and retain the copy for your files.

(c) In the enclosed form of release (an August 30, 1979 letter addressed to the tenants), Nicholas wrote (emphasis added):

> Please be advised that we are authorized, *as the agents for the beneficiaries of LaSalle National Bank Trust No. 24739,* to agree with you. . . .

---

**2.** That statement in the affidavit is plainly false. Each page of the financial statements specifically states, "The accompanying notes are an integral part of this statement." It is apparent from the facts stated in footnote 1 and this footnote that Nicholas has paltered with this Court.

Approval was provided for and executed by *Meridian* (Prassas having prepared the form for such approval).

(d) On June 20, 1980 Prassas sent the same tenant's proposed release for *Meridian's* approval. Such approval was provided for and executed by Meridian (*Prassas* having added the provision for Meridian's approval to the tenant's form of release, which had not contained such a provision).

### Meridian's Status as a Joint Venturer

It would be charitable to characterize Prassas' arguments on this score as specious, for they lack even the surface plausibility necessary to earn that label. There is no room in this case for application of the partnership law distinction between the sale of an interest in partnership assets (which does not carry with it partnership status) and the assignment of the partnership interest itself, which requires the consent of the other partner before the assignee becomes a partnership member (Ill.Rev.Stat. ch. 106½, § 18(g)).

■ Based on the uncontroverted evidence submitted by the parties, the Court concludes that the provisions of the Illinois Uniform Partnership Act were satisfied because Prassas *consented* to Meridian's becoming the successor joint venturer to Allister.[3] Such consent was manifested by Prassas' conduct, recited in detail in the "Facts" section of this opinion and not necessary to be repeated here.[4] Indeed, Prassas seeks to rely on Ill.Rev.Stat. ch. 106½, § 27(1) to contrast an entry into a partnership with the assignee's mere right to receive partnership profits:

> A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership to interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the. partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.

Yet Prassas itself *recognized* and *acted on* Meridian's right to participate in management and administration, to receive information on account of partnership transactions and to receive the Venture's financial statements. It accorded Meridian the depreciation treatment specifically provided by the Agreement for its fellow joint venturer, *not* for a mere distributee of the money representing an assignor venturer's share of profits. All these things flatly belie Prassas' present contention.

Moreover, even apart from the fact that Prassas consented by its actions to Meridian's having become a member of the Venture, there are two other independent grounds for the rejection of Prassas' argument:

■ 1. Meridian of course knew of the fact that its subsidiary, Allister, had become a joint venturer, and was treated by Prassas as such, simply by virtue of an instrument of assignment from Alexander comparable to that later entered into between Allister and Meridian. That earlier instrument did not call for Prassas' consent to the assignment. Thus all of the classic ingredients of estoppel are present against Prassas regarding the Allister-Meridian assignment.

---

**3.** In doing so the Court is mindful of and has applied the principle that the burden of demonstrating the absence of any material issue of fact is upon the movant for summary judgment and that all reasonable inferences from the facts are to be drawn against the movant. *Dreher v. Sielaff*, 636 F.2d 1141 (7th Cir. 1980).

**4.** Of course consent is not limited to the execution of a specific document, such as that Prassas gave Allister *at its request* more than two and one-half years after it had acquired its interest and had been treated by Prassas as a joint venturer, just as Prassas treated Meridian for nearly two years after it subsequently acquired the same interest. See *Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co.*, 29 Ill.App.3d 819, 822, 331 N.E.2d 238 (1st Dist. 1975).

■ 2. Under partnership law no partner has any assignable interest in any *specific* asset of the partnership (Ill.Rev.Stat. ch. 106½, § 25(2)(b)), but a partner has an assignable interest in the partnership itself (*id.* at § 27(1)). It is an assignment of the *latter* interest that gives an assignee the right to profits but not to partnership status. But what Meridian received from Allister was an assignment of the *beneficial interest in the real estate*, which was and is the principal specific asset of the partnership. Prassas honored and acted in accordance with that assignment, ratifying its validity as a matter of law and thereby treating Meridian as a partner-joint venturer. Thus the doctrine sought to be invoked by Prassas does not in terms apply. These distinctions are of course technical, but nothing more is due to the hypertechnical—and equitably and legally unsound—arguments advanced by Prassas.[5]

*Dissolution of the Joint Venture*

■ One of the many flaws in the *Erie v. Tompkins* doctrine is that it places the federal courts not on a parity with the state courts in diversity cases (as its proponents claim), but rather makes them subordinate. If a lower state court regards a decision of its higher court as outmoded or too broad, it may reach a different decision and leave review to the higher court. That luxury is not permitted to the federal court, which must slavishly follow the state precedent.[6]

This action exemplifies the difference. In *Maimon v. Telman*, 40 Ill.2d 535, 538, 240 N.E.2d 652 (1968), the Illinois Supreme Court said:

This court has indicated that joint adventures have, in general, the legal incidents of a partnership. (*Ditis v. Ahlvin Construction Company*, 408 Ill. 416, 427 [97 N.E.2d 244]; *Harmon v. Martin*, 395 Ill.

595 [71 N.E.2d 74].) Under familiar rules of partnership, if no date is specified in the agreement it may be terminated at the will of either partner. (Ill.Rev.Stat. 1965, chap. 106½, par. 31.) Defendant contends that some authorities do not apply the partnership rule to termination and cites *Eagle Picher Co. v. Mid-Continent Lead & Zinc Co.* (10th Cir.), 209 F.2d 917, as supporting such a view. In that case, although the opinion stated that a joint adventure is generally considered a partnership, the court held that there could be no termination of a joint adventure by unilateral action until its purpose was accomplished. "As a general rule, if no date is fixed by the contract of joint adventure for its termination, the agreement remains in force until its purpose is accomplished, or until such accomplishment has become impracticable." (30 Am.Jur., Joint Adventures, sec. 28.) We think the rule is sound.

It thus made a distinction (one of the few) between the law applicable to joint venturers and partnership law generally, under the latter of which an agreement lacking a termination date or term makes the partnership terminable at will, Ill.Rev.Stat. ch. 106½, § 31.

Meridian seeks to rely on two Illinois Appellate Court decisions, one before *Maimon* and the other after: *State House Inn Corp. v. Polikoff*, 86 Ill.App.2d 97, 230 N.E.2d 283 (1st Dist. 1967) and *Polikoff v. Levy*, 132 Ill.App.2d 492, 270 N.E.2d 540 (1st Dist. 1971). Despite Prassas' efforts to distinguish the cases, this Court views the two *Polikoff* cases as essentially inconsistent with the *Maimon* doctrine. But an Illinois Appellate Court cannot of course overrule the Illinois Supreme Court, as Prassas correctly observes, and this Court cannot

5. Prassas is of course trying to preserve its position of deriving 50% of the cash flow from the property in which it has no investment, meanwhile having controlled the lack of further development that would bring the property to the 500 front foot benchmark. It obviously does not recognize the fiduciary obligations

that normally attach to its status as a joint venturer or as self-recognized "agent for the [land trust] beneficiaries."

6. See Crosskey, *Politics and the Constitution* ch. XXVI (1953), and particularly discussion at 916–19 ff.

therefore decide that it prefers *Polikoff* and therefore ignore *Maimon*.[7]

Because "no date is fixed by the [Agreement] for its termination," the question as to termination becomes whether the Agreement's purpose has been accomplished or accomplishment has become impracticable. This Court finds persuasive Prassas' argument that the 500 front foot provision of Agreement ¶ 7 represents a floor for the concept of "fully developed" in Paragraph 4, so that it cannot be said that the Agreement's purpose as to *all* of Project No. 1 "is accomplished." And though on a trial the finder of fact might determine that "such accomplishment has become impracticable," on Meridian's motion for summary judgment it would be improper to make such a determination.

However, the parties have paid insufficient attention in their briefs to the Agreement provision this Court finds dispositive of the present controversy, Paragraph 4 (emphasis added):

> It is agreed that First Party may develop Project No. 1 in separate stages consistent with economic operation and *the terms and conditions of this agreement shall apply separately to each stage* until the property in Project No. 1 shall have been fully developed.

Prassas (page 11 of its November 13 memorandum) and Meridian (page 10 of its September 22 memorandum) *agree* that the construction to date represents "separate stages" of the development of the property, as indeed the realities of the situation compel. What Prassas chooses to ignore in its arguments is the provision underlined in the above quotation. Prassas gives that provision no meaning, and it is fundamental in contract law that a document is to be construed so as to give meaning to each of its provisions.

This Court concludes that the underlined language means clearly that where the joint venturers have chosen—as they did here—to make the initial shopping center development a *separate* stage, and the remodeling and expansion of the Jewel store a *separate* stage (those being admittedly the "separate stages consistent with economic operation" when they were respectively constructed), the intention was to treat the aggregate of those separate stages as a *separate* joint venture. That is the normal thrust of the Agreement provision that "the terms and conditions of this agreement shall apply *separately* to each stage."

There is no question that the Agreement's purpose of development "is accomplished" with respect to the portion of the property involved in those stages, a discrete tract of some five acres. That portion has been operated as an integral and self-contained unit for another eight years without any plan of further development. Accordingly, *Maimon* by its terms permits termination of the joint venture between the parties as to *that* portion of the property. As for the remainder of the property, the joint venture may continue in effect until either *Maimon* condition has been satisfied, or until the parties agree in accordance with Agreement ¶ 8 to sell that property as vacant.

### Conclusion

This Court finds that (1) with respect to (a) Meridian's membership in the joint venture and (b) accomplishment of the joint venture's purposes regarding the presently improved portion of the property (the separate stages chosen by the parties themselves), there is no genuine issue as to any material fact and (2) with respect to the remainder of the property, there are genuine issues as to material facts. Meridian is therefore entitled to a judgment as a matter of law with respect to its joint venture membership in the approximately five acre tract now improved and operating as a shopping center, but its motion for partial

---

**7.** It is true that the *Maimon* statement was dictum, because the Supreme Court held that the terms of the joint venture involved called for the *partnership* rule of termination at will. However, it still represented a reasoned statement of what the Illinois Supreme Court regarded as sound principle.

summary judgment is denied as to the remaining joint venture property. Prassas' cross-motion for summary judgment is denied. Meridian is directed to submit a proposed form of order for the dissolution of the joint venture relating to the presently improved portion of the property on or before January 20, 1981, and Prassas is ordered to submit any comments on the proposed form of order on or before January 27, 1981.

Frank Kevin POOL, Plaintiff,